# PLAINTIFFS/COUNTERCLAIM DEFENDANTS' APPENDIX OF EVIDENTIARY MATERIALS SUPPORTING SUMMARY JUDGMENT

## NO. 5

1

```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
 2                      SOUTH BEND DIVISION

 3
        PRESS GANEY ASSOCIATES,    )
 4      INC., and PG HOLDCO, LLC,  )
                                   )
 5                                 )
        Plaintiff/                 )
 6      Counterdefendants,         )
                                   )
 7      v.                         )    Case No:
                                   )    3:12-CV-437-JTM-CAN
 8      REGINALD W. DYE,           )
                                   )
 9                                 )
        Defendant/                 )
10      Counterplaintiff,          )
                                   )
11      v.                         )
                                   )
12      VESTAR CAPITAL PARTNERS    )
        V, L.P. (d/b/a VESTAR      )
13      CAPITAL PARTNERS, INC.),   )
                                   )
14           Counterdefendant.     )

15

16
                     The Deposition of ANDREW LAMBERT
17                   Wednesday, August 7, 2013
                     3:22 p.m.
18                   Suite 2130, Four Seasons Building
                     75 14th Street,
19                   Atlanta, Georgia

20

21      Called as a witness by the Plaintiff/Counterdefendant in
        accordance with the Federal Rules of Civil Procedure
22      pursuant to notice.

23
        REPORTED BY:
24      TERESA BISHOP, RPR, RMR
        Notary public, Cobb County, Georgia
25
```

**ANDREW LAMBERT - August 7, 2013**

17

1      A.   I hate to say it in the past, but their

2   business was one of a mobile technology that was

3   designed to give the person, the patient, mobility of

4   their medical record so they can go from hospital A to

5   hospital B and the physician's office, C, if you will,

6   and have a continuous aspect of their medical record

7   that is not just tied to a given hospital.  That's the

8   intent.

9      Q.   Okay.  How long did you work at Cognivent?

10     A.   About -- I want to say about eight months,

11  seven to eight months.

12     Q.   What was your first date of employment?

13     A.   October, I think.

14     Q.   October of 2012?

15     A.   Correct.  September or October, one of the

16  two.  I can't recall right now.

17     Q.   Before you worked for Cognivent, did you have

18  any -- who was your previous employer?

19     A.   Press Ganey.

20     Q.   And your last day of employment with Press

21  Ganey was May 3rd of 2012?

22     A.   May 3rd or 4th.  I think it was the 4th

23  actually.

24     Q.   Of 2012?

25     A.   Yes, ma'am.

ANDREW LAMBERT - August 7, 2013

18

1      Q.   So between May of 2012 and September or

2  October, what did you do?

3      A.   I filled a few bucket lists, to be honest with

4  you.  Took some time off to kind of figure out what I

5  wanted to do.  Rode the heck out of my motorcycle.  And

6  did a lot of honey-dos.

7      Q.   You worked at Press Ganey as vice president of

8  sales for the national accounts and new sales, right?

9      A.   And medical --

10     Q.   And medical sales?

11     A.   Medical services.

12     Q.   So what was your official title on your

13  business card?

14     A.   Vice president of new sales and national

15  accounts and medical services.

16     Q.   So it was a long line, there wasn't anything

17  that encompassed all of that?

18     A.   I don't recall, to be honest.  I don't know.

19     Q.   Was that the position that you were hired for

20  at Press Ganey?

21     A.   That is correct.

22     Q.   Who hired you?

23     A.   Al Vega and a host of other people, I guess.

24  But he was the hiring manager.

25     Q.   You started work at Press Ganey in 2009?

**ANDREW LAMBERT - August 7, 2013**

39

1    would say continued when he went to work at Press Ganey?

2         A.    That's -- we're talking about his personality,

3    yes.

4         Q.    Did you like working for him?

5         A.    Absolutely.  Yeah, I like to be in a situation

6    where my efforts good or bad, in terms of efforts like

7    any athlete might be, is you're rewarded for being a

8    good athlete and a good business person or not.  And so

9    it's pretty black and white.

10        Q.    Did you consider yourself to be a peer of Mr.

11   Vega?

12        A.    No.  No.

13        Q.    He was somebody -- did you look to him as a

14   mentor at all?

15        A.    Frankly at my ripe age I didn't need much

16   mentoring.  But he was my boss, so no, he's not my peer,

17   he was my boss.

18        Q.    And explain to me kind of the nature of the

19   interaction when you were at Press Ganey?  How often,

20   for example, did you communicate with Mr. Vega?

21        A.    We would have monthly meetings, he would have

22   it with all his team members at least once a month

23   actually.  Depends on where it was in the quarter.

24              As the quarter was nearing its end, we would

25   have more frequent calls.  And it was with me, Jason

ANDREW LAMBERT - August 7, 2013

40

1    Hahn and Jeri Judkins.  The three of us were the

2    principal sales leaders.  And then I would bring in, as

3    need be I would bring in John McNeese or Todd Gunter,

4    who were the two VPs that reported to me for their

5    business units.

6         Q.   John McNeese was at the time you left Press

7    Ganey, he was vice president of new sales, is that

8    right?

9         A.   That's correct.  Correct.

10        Q.   Who hired Mr. McNeese?

11        A.   I did.

12        Q.   And when you made the decision to hire Mr.

13   McNeese, why did you hire him?

14        A.   Because there was an open role there because

15   Reggie had moved into a VP of operations sales role.

16        Q.   And what about Mr. McNeese made him qualified

17   for the position?

18        A.    Mr. McNeese has been around the block about as

19   long as I've been around the block, and he and I worked

20   together at Cerner and I have to this day a very strong

21   appreciation and respect for the man.

22        Q.   Have you crossed paths since you left Press

23   Ganey with Mr. McNeese?

24        A.   Saturday.

25        Q.   This past Saturday?

**ANDREW LAMBERT - August 7, 2013**

41

 1      A.    Yes, ma'am.

 2      Q.    What was the nature of that communication?

 3      A.    Well, I was over at his cabin on Table Rock

 4   Lake drinking wine, telling lies.  What more do you want

 5   to know?

 6      Q.    Well, and you answered part of it.  I'm

 7   assuming you're friends then?

 8      A.    I think you can make that assumption, yes,

 9   ma'am.

10      Q.    And have you been friends with him since you

11   worked with him at Cerner?

12      A.    Yes.

13      Q.    So there's a personal as well as a

14   professional relationship since then?

15      A.    Yes, yes, we've been good friends for a long

16   time.  We went separate ways for a number of years, you

17   know, different areas of health care.  But we've always

18   kept in touch.

19      Q.    And when you hired Mr. McNeese at Press Ganey,

20   did you make the key decisions about the terms of his

21   employment?

22      A.    You'll need to explain what you're asking.  I

23   didn't understand the question.

24      Q.    Who decided which position he was going to be

25   in, was that you?

ANDREW LAMBERT - August 7, 2013

42

```
1        A.    That was me, absolutely.

2        Q.    And who decided how much he would be paid?

3        A.    That was a combination of myself and HR,

4   because they had ranges like any HR department would

5   have for given roles.

6        Q.    Okay.  And those ranges depended on what, do

7   you know?

8        A.    I don't know.  I don't know.

9        Q.    At some point, Mr. McNeese when he was working

10  for you as VP of new sales at Press Ganey was criticized

11  by Al Vega, do you recall that?

12       A.    Because of the numbers.

13       Q.    Exactly.  You said that Mr. Vega was kind of a

14  black and white person?

15       A.    Correct.

16       Q.    When you said black and white, do you mean to

17  say he was paying attention to the numbers?

18       A.    Mr. Vega or --

19       Q.    Yes.

20       A.    Oh, absolutely.

21       Q.    And John McNeese wasn't hitting the numbers,

22  is that right?

23       A.    I would say he was trying to restructure his

24  team which needed restructuring.  There was a bunch of

25  open positions that needed to be filled.  So his was a
```

ANDREW LAMBERT - August 7, 2013

53

1       Q.    That would be the only one?

2       A.    That's the only one I can think of, yeah.

3   Besides the fact he was an air force guy, but we don't

4   hold that against him.

5       Q.    Being a navy man or the son --

6       A.    The son of a navy man.

7       Q.    So then what was your understanding of why

8   Reggie moved from VP of new sales into sales operations?

9       A.    Well, there was an absolute, absolute need for

10  an operations person for sales.  We had the worst CRM,

11  contact relation management.  It was probably from the

12  dark ages time.  I think internally developed mainly for

13  finance and certainly not for sales.

14          So a lot of internal selling to the company,

15  to the CFO and CEO at the time, Rob Draughon, that we

16  needed to have something that was going to be a

17  sales-focused type of a CRM application called

18  salesforce.com.

19          In order to maximize the salesforce.com, you

20  have to have somebody administering it, managing it,

21  basically baby-sitting it and growing it.  Which that

22  was right up his alley, because that's, as I said, one

23  of his skill sets is an analytics type of person.

24          The other thing, too, which was desperately

25  needed was a person who would sit at the center of

**ANDREW LAMBERT - August 7, 2013**

76

1    on the phone so I didn't see him.  I'm not sure whether

2    the first time I actually met him was at the trip in

3    Grand Cayman or not.  If it wasn't the first time, it

4    would have been the second time.  I just don't remember

5    the first time.

6        Q.   When was the first time you remember having a

7    conversation with Mr. Ryan?

8        A.   The only time I had a conversation with him

9    was at the trip, which was just an introducing my wife

10   to him type of -- that type of thing.

11            But we went to, who was it, some health system

12   in Michigan in the Detroit area, and we met with their

13   CEO and a couple of his minions, and that was the first

14   time I ever had been with him for any period of time.

15   And the following morning I'm landing in Springfield,

16   Missouri, and get a phone call and I'm fired.

17       Q.   Was that at McLaren?

18       A.   Thank you, that's correct.

19       Q.   And that meeting was in early May of 2012?

20       A.   Well, let's see.  The date of my phone call

21   was May 4th, so that meeting was May 3rd.

22       Q.   I don't want to quibble with your memory, but

23   according to the records that we've seen, May 3rd seems

24   to be the date of the phone call.  Is that --

25       A.   You may be right.  You may be right.  I

**ANDREW LAMBERT - August 7, 2013**

77

1    thought that my last day was May 4th, so I'm going on

2    the basis of what that is.  That's what the records show

3    for me.

4         Q.   I don't want to quibble, but if you want --

5             MR. TYLER KASPERS: We'll agree it's May

6         3rd.

7             THE WITNESS:  That's fine, I don't have

8         a problem with that.

9  BY MS. GOZDECKI:

10       Q.   In dealing with Mr. Ryan, had you ever heard

11  about the term the 19-second rule?

12       A.   I heard about it after the fact, but never

13  during the course of my time there.

14       Q.   I'm sorry, go ahead.

15       A.   Go ahead and ask your question.

16       Q.   What did you hear after the fact?

17       A.   I heard that something occurred with Jason

18  Hahn, one of his clients, and I don't know the specifics

19  of it, but he was called into his office and the term

20  19-second rule came as a result of that meeting, meaning

21  that if there's anything going on with the client, he

22  wants to know about within 19 seconds.

23         But I heard about that after the fact.  I had

24  not heard that before.

25       Q.   What about the term prime minister?

**ANDREW LAMBERT - August 7, 2013**

114

1       Q.   Mr. Lambert, tell me about Banner Health.  Was

2   Banner Health -- and let's begin with the pitch that you

3   made to Banner Health with Deirdre Mylod and Dave Keller

4   in approximately the spring of 2012.

5       A.   Well, there was actually two pitches, one of

6   which I wasn't part of.  And I did not make a pitch, per

7   se.  I was there in collaboration, I guess the best way

8   to characterize it, coming straight back from Grand

9   Cayman directly, as a matter of fact, to Phoenix.

10  And --

11      Q.   And Phoenix because Banner Health was based in

12  Phoenix?

13      A.   That is correct.  And we presented to their

14  committee, which was comprised of 20 some, 25 people, I

15  don't remember the number.  And left after that.

16      Q.   Had there been a previous presentation made to

17  Banner Health before?

18      A.   Several times, yes.

19      Q.   By whom?

20      A.   Dave Keeler, and I think Deirdre might have

21  been part of it, too.  I don't recall that part.

22      Q.   So why did you go to Banner Health straight

23  from the meeting at the Grand Cayman?

24      A.   Not because I wanted to, but that was the date

25  of the meeting.  It was a final committee meeting.  And

ANDREW LAMBERT - August 7, 2013

116

1      Q.   And why did you decide that you needed to go

2  to Banner Health?

3      A.   Because Dave Keeler asked me to.  And when

4  people ask me to be a part of it, I acknowledge that and

5  support them.

6      Q.   When did Dave Keeler ask you to be a part of

7  that presentation?

8      A.   I have no idea.

9      Q.   Was it immediately before it, you know, was --

10      A.   No, no, it was planned in advance.  But it

11  just happened to fall on the following day at the

12  conclusion of our trip to Grand Cayman, so I had to drop

13  my wife -- well, I didn't drop her off, we went two

14  different directions from that meeting or that club

15  trip.

16      Q.   And based on your experience at that

17  presentation, what was your impression of how your

18  colleagues presented to Banner Health?

19      A.   Very well.  And the reception was very well,

20  too.  I mean, our read on the audience was very positive

21  feedback.

22      Q.   Did you have any concerns about getting the

23  account?

24      A.   You always do.  I mean, I live in a world of

25  paranoia, you know.  You don't bank on it until it's

ANDREW LAMBERT - August 7, 2013

118

1    say -- because it's either you win the business or you

2    don't.  It's a zero sum game.  Zero or 100 percent.  So

3    you handicap it on the basis of your expertise, your

4    read of the situation, et cetera, et cetera.  And I felt

5    it to be about an 80 percent, 75 to 80 percent

6    likelihood.  So it was handicapped.

7        Q.    It was uncertain, but as you said, a high

8    probability?

9        A.    And that goes on your gut and the people you

10   know there and friends you make and coaching you get,

11   and that type of thing, sure.

12       Q.    Right.  And then at some point at the end of

13   April, beginning of May, you heard from Banner that they

14   had selected NRC, is that right?

15               MR. WILLIAM KASPERS:  Object to form.

16               THE WITNESS:  I did not hear from

17          Banner.

18   BY MS. GOZDECKI:

19       Q.    What did you hear?

20       A.    I heard from my national accounts person

21   initially.  Was putting calls in to follow up on it.

22   Wasn't getting any response back, which is never a good

23   sign, of course.

24       Q.    So you were putting calls in on it or Dave

25   Keeler?

ANDREW LAMBERT - August 7, 2013

119

1          A.    It was Dave Keeler's account and he reports to

2    me or reported to me.  So he was placing phone calls in

3    to figure out what was going on and, you know, when were

4    they making the decision.  Because the decision point

5    was sliding.  It was supposed to be a certain date and

6    typically in these organizations they don't hold to

7    their dates.  So he put in several calls and wasn't

8    getting any feedback or any call backs.

9          So he called me and says, you know, I'm not

10   getting any call backs.  I'm a little worried about

11   this.  So I did the right thing, I let Al know this is

12   what the status is because everybody knew that this was

13   a deal that we were waiting on receiving or getting

14   acknowledgement for.

15         So I just said I want to let you know, we're a

16   little concerned here because we're not getting any

17   feedback.

18         I don't remember what the time span was

19   between that and the follow-up call, but the follow-up

20   call that Dave did make did connect, whether he

21   connected or they connected with him I don't recall,

22   saying that the committee had chosen to go another way.

23   And so immediately I called Al and said, okay, you know,

24   here's what we're hearing, we've got to go to plan B

25   here, figure out who we can go to in the organization to

ANDREW LAMBERT - August 7, 2013

120

1    overturn, or whatever the case may be, the committee

2    vote.

3           Which is not unusual to have happen.  It's

4    happened many, many times in my career and I'm sure in

5    many other people's careers.  The committee votes one

6    way, you make a value, cogent business argument to the C

7    suite, we're market leaders.  It's like the old adage,

8    nobody fired somebody for hiring IBM.  That's who we

9    were.  So that kind of conversation.  Not quite that

10   way, but along those lines.

11          So we were putting together a plan B or

12   whatever our plan was to go after the CMO and people

13   above the committee, because these were all users,

14   technical buyers, if you will.  And that's what we were

15   in the process of doing.

16      Q.    When you said, I want to get this right, I

17   think you said you heard from Dave --

18      A.    Correct.

19      Q.    -- that the committee vote had gone another

20   way?

21      A.    That is correct.

22      Q.    What specifically happened in that

23   conversation?

24      A.    That's a year and a half ago, so -- he called

25   and said, you know, that the committee is going a

ANDREW LAMBERT - August 7, 2013

121

1    different direction, which was NRC, that they had chosen

2    NRC and that was the extent of it.  I said, okay, now we

3    got to figure out what is our next step.

4            Because you don't give up, you don't die, you

5    don't roll over, that's not our nature.  So you figure

6    out, okay, what do we do now.  Let's talk about who we

7    go after, who we need to talk to to overturn that or to

8    change the game.

9        Q.   And you said that you immediately called Al --

10       A.   Yes.

11       Q.   -- to talk to him about that?

12       A.   Yes.

13       Q.   And what was the plan that you came up with?

14       A.   Well, we hadn't come up with a plan yet,

15   frankly speaking.  But the plan was to get ahold of the

16   CMO.  Pat had made some comments about knowing people

17   there several weeks ago or several weeks prior to that,

18   rather, that he was going to reach out and make a

19   connection with the CEO or somebody.  I don't remember

20   who he knew there.

21           And I think Al had reached out to Pat when I

22   made the first call to him saying we're not getting any

23   feedback there, and I think Al told me he was going to

24   call Pat to see if he had connected with anybody at

25   Banner yet or if he would.  And apparently Pat was

ANDREW LAMBERT - August 7, 2013

122

1    supposed to do that.  That's all I know.

2        Q.   So as soon as you heard from Dave --

3        A.   Right.

4        Q.   -- this is where you said we've got to go to

5    plan B?

6        A.   Yeah, we got to figure out, what is your next

7    step.

8        Q.   Okay.  And is it true that you didn't want too

9    many people to know about it?

10       A.   Well, what I didn't want to have happen is you

11   send off a red flare without us having the opportunity

12   to try to go in there and fix it, because we've done

13   that many times before.  So you don't go -- it's the

14   crying fire in a movie theatre.  You know, it was too

15   early to call fire, because we've turned these things

16   over many, many times.

17       Q.   Don't you think it was important to let Pat

18   Ryan know about it?

19       A.   Well, I went to my boss and Pat doesn't accept

20   calls from people other than Al.

21       Q.   Had you ever tried to call Pat Ryan before?

22       A.   No, I was advised not to do that because he

23   chewed somebody else out for doing it.

24       Q.   And you were advised by Al Vega not to call

25   Pat directly?

123

1          A.    I believe it was Al, yeah.

2          Q.    So you went to Al directly, not to Pat Ryan?

3          A.    He's my boss, chain of command.

4          Q.    I'm handing you, Mr. Lambert, what is

5     Deposition Exhibit Number 29.  It's been previously

6     marked and has been part of the record in connection

7     with other depositions in this case.  It may -- it may

8     be that portions of it you've not seen.

9               MR. WILLIAM KASPERS: Do you have

10              another copy?

11              MS. GOZDECKI:  Yes, I do.

12              THE WITNESS:  Yeah.

13    BY MS. GOZDECKI:

14         Q.    Deposition Exhibit 29 references the news

15    about Banner --

16         A.    Sure.

17         Q.    -- is that right?

18         A.    Sure.

19         Q.    Okay.  And Reggie Dye at the bottom of the

20    first page of Deposition Exhibit 29 sends an e-mail to

21    Lisa Weisser, right?

22              MR. TYLER KASPERS:  Objection.  How

23              would he know?

24              THE WITNESS:  I wouldn't have known

25              that.

**ANDREW LAMBERT - August 7, 2013**

124

1    BY MS. GOZDECKI:

2         Q.   I'm asking you about Deposition 29, right?

3         A.   Yes.

4         Q.   And it indicates that there's an e-mail from

5    Reggie Dye to Ms. Weisser, right?

6         A.   Yes.

7         Q.   And my question for you is who is Lisa

8    Weisser?

9         A.   Lisa worked for -- I don't know if she worked

10   for him or not, for Reggie.  She was the proposal lady,

11   writes the proposals.  So I don't recall if she reported

12   to Reggie or not.  I think she did.

13        Q.   Reggie made the statement that he had -- that

14   you had called him, is that right?

15             MR. WILLIAM KASPERS: Object to form.

16             THE WITNESS:  I probably did because I

17             had to update what the forecast was just to

18             let him know this is going on, so that made

19             that forecast that much shakier at that

20             point.

21   BY MS. GOZDECKI:

22        Q.   So did you -- I'm sorry.  So you remember

23   calling Reggie about what happened with Banner?

24        A.   I don't remember the conversation, but

25   obviously I did, so --

ANDREW LAMBERT - August 7, 2013

125

1      Q.    And the purpose of it would have been?

2      A.    Just to advise him what was going on, sure.

3   Because we were very -- all of us were in close contact

4   with Reggie about where we were in the month or in the

5   quarter, whatever the case may be.  And if something was

6   getting hedged or hedgy, then it was my responsibility

7   to let him know that.

8      Q.    So you talked to Dave Keeler by telephone?

9      A.    Yes.

10     Q.    And then you talked with --

11     A.    Al.

12     Q.    And then you talked with Reggie?

13     A.    I would imagine that was the chronology of it.

14     Q.    Was there anybody else that you contacted?

15     A.    I think I mentioned it to Deirdre just out of

16  respect for her, that this is what we're hearing from

17  Banner.

18     Q.    Do you remember texting Deirdre?

19     A.    I don't remember whether I texted her or

20  called her.  I don't remember which it was.

21     Q.    Well, hadn't you been with Deirdre at McLaren,

22  in a presentation for McLaren?

23     A.    Yes, uh-huh.

24     Q.    Perhaps the same day or very close to that

25  time?

**ANDREW LAMBERT - August 7, 2013**

126

1      A.    I don't remember the time frame on that at
2  all.  I don't remember.
3      Q.    Okay.  And you're saying today that you don't
4  remember whether or not you texted Deirdre?  I just want
5  to make sure.
6      A.    I don't know.  I don't know whether it was a
7  phone call or a text or e-mail.  I don't know which it
8  was.
9      Q.    Okay.  And what kind of -- let me ask you
10 about this.  This is Deposition Exhibit Number 28, Mr.
11 Lambert.
12          Gentlemen, do you need another copy?
13          MR. TYLER KASPERS: Yes.
14          THE WITNESS:  That's the e-mail, that
15          was the answer to your question.
16 BY MS. GOZDECKI:
17     Q.    Right.  So my question to you about Deposition
18 Number 28 is, do you remember sending the e-mail?
19     A.    I do now that I'm reading it, yes.
20     Q.    So it appears that you had already shared some
21 of this information because you don't explain in the
22 e-mail what happened?
23     A.    The three that I just mentioned, yes.
24     Q.    And your e-mail to them was, please keep
25 completely mum about above to anyone internally as we

ANDREW LAMBERT - August 7, 2013

127

1    are developing a plan and cannot afford to let the word
2    get out?
3        A.   Sure.
4        Q.   And what do you mean when you say you can't
5    afford to let the word get out?
6        A.   It's before we have -- you have to understand
7    in our business you get committees that make decisions
8    all the time.  Oftentimes they are overridden by the
9    CXOs.  They let them go through their little process and
10   at the end of the day the decision is made at the
11   executive level, anyway.
12            So running to whomever and saying, you know,
13   the sky is falling when we haven't even taken the
14   opportunity of going in there and fixing it, changing
15   the decision to our way, is ludicrous.  It's like, you
16   know, the wolf running around or sheep calling, whatever
17   that -- you know what I'm trying to say.
18       Q.   Sure.  But I can understand you not wanting it
19   to get out externally.  But why didn't internally, why
20   does that matter?
21       A.   For the same reason I just pointed out.
22   Internally who needs to know this at this particular
23   point, because we're going to create that plan
24   ourselves.
25            You know, you're looking at it from the

#28

| | |
|---|---|
| **From:** | Andrew Lambert <ALambert@pressganey.com> |
| **Sent:** | Wednesday, May 2, 2012 6:51 PM |
| **To:** | Reggie Dye <RDye@pressganey.com>; Deirdre Mylod <DMylod@pressganey.com>; David Keeler <DKeeler@pressganey.com> |
| **Subject:** | Banner |

All:

Please keep completely mum about above to anyone internally as we are developing a plan and cannot afford to let the word get out..

Thx

Andy

Sent from my iPhone

EXHIBIT 28
WIT: Dye
DATE: 6-19-13
CINDY MAHONEY, RPR, RMR

PG2.000049

| | |
|---|---|
| **From:** | Dan Farrell <DFarrell@pressganey.com> |
| **Sent:** | Thursday, May 3, 2012 5:19 PM |
| **To:** | Patrick Ryan <PRyan@pressganey.com>; Patricia Cmielewski <PCmielewski@pressganey.com> |
| **Subject:** | FW: Banner News |

Pat, Patti,

Looks like there is news on Banner that was being held back.

Dan

**From:** Lisa Weisser <LWeisser@pressganey.com>
**Date:** Thu, 3 May 2012 16:10:11 -0400
**To:** Dan Farrell <dfarrell@pressganey.com>
**Subject:** FW: Banner News

FYI.

**From:** Reggie Dye
**Sent:** Wednesday, May 02, 2012 6:52 PM
**To:** Lisa Weisser
**Subject:** RE: Banner News

Hey Lisa,

Just got this from Andy as well. Looks like they're trying to salvage so definitely keep to yourself for now. Thanks!

All:

Please keep completely mum about above to anyone internally as we are developing a plan and cannot afford to let the word get out..

Thx

Andy

*Reggie*

*The only sustainable competitive advantage is continuous innovation, which requires inspired players.*

**From:** Reggie Dye
**Sent:** Wednesday, May 02, 2012 3:38 PM
**To:** Lisa Weisser
**Subject:** Banner News

Lisa,

Just got a call from Andy...Banner went with NRC. Reason we were given is that they had more flexible reporting. A typical reason from a committee of technical buyers vs. a strategic decision made by an executive team. What's funny is

EXHIBIT 29
WIT: ____
DATE: 6-19-13
CINDY MAHONEY, RPR, RMR

that they allegedly had gone with Avatar because their reporting was cooler!

Al and I know, but we're not ready for public disclosure so please keep this to yourself for now until Andy is ready to make it known.

*Reggie*

*The only sustainable competitive advantage is continuous innovation, which requires inspired players.*

**Reggie Dye**
Vice President, Sales Operations
Press Ganey Associates, Inc.
*Outcomes driven. Performance strong.*
480.588.8425 (Office)
480.245.9770 (Cell)
rdye@pressganey.com
pressganey.com

PG3.000056