UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| PRESS GANEY ASSOCIATES., INC. and PG HOLDCO, LLC, | ) ) ) |
| Plaintiffs/Counterdefendants, | ) ) |
| v. | ) CAUSE NO. 3:12-cv-437-CAN ) |
| REGINALD W. DYE, | ) ) |
| Defendant/Counterclaimant, | ) ) |
| v. | ) ) |
| VESTAR CAPITAL PARTNERS V, L.P., | ) ) |
| Counterdefendant. | ) ) |

**OPINION AND ORDER**

**I.   INTRODUCTION**

The core of the dispute between these parties originates from an employment relationship gone bad. Press Ganey Associates, Inc. ("Press Ganey") hired Reginald Dye as Vice President of New Sales on October 5, 2009. Dye signed a contract in March 2010, with PG Holdco, LLC ("PG Holdco"), Press Ganey's parent company, in which he promised to refrain from certain restricted activities in exchange for "management units" of significant value from PG Holdco. In February 2012, Press Ganey hired a new Chief Executive Officer who made personnel changes including terminating Dye on May 3, 2012.

Dye then entered into a Separation Agreement with Press Ganey and PG Holdco in which Press Ganey agreed to pay Dye $111,574.28 in severance pay and to repurchase Dye's management units for $76,745.88 pursuant to the 2010 contract. In the Separation Agreement,

Dye released any claims against Press Ganey, its subsidiaries, and affiliates and reiterated his commitment to refrain from engaging in the same restricted activities identified in the 2010 contract. Soon thereafter, Dye began working for a new employer. Press Ganey and PG Holdco contend that Dye's new employment constitutes restricted activity in violation of the 2010 contract as well as the Separation Agreement. As a result, Press Ganey and PG Holdco seek the return of the money they paid to Dye pursuant to the Separation Agreement.

Dye counters that his new employment does not violate his contracts with Press Ganey and PG Holdco, and further, that Press Ganey and PG Holdco discriminated against him on the basis of his race and his age. Dye also alleges that Press Ganey and PG Holdco intentionally caused him emotional distress before, during, and after his termination. Dye has also sued Vestar Capital Partners V, L.P. ("Vestar"), a private equity fund with interest in Press Ganey through its ownership of a majority of the equity interests of PG Holdco, alleging that Vestar and Press Ganey jointly employed him such that Vestar is also liable for all of Press Ganey's actions against him.

Press Ganey and PG Holdco, Dye, and Vestar have all filed motions for Summary Judgment. For the reasons that follow, the Court concludes that Dye's current employment breaches his contracts with Press Ganey and PG Holdco, and that as a result, Press Ganey and PG Holdco are entitled to a return of the money they paid Dye. Additionally, because Press Ganey and PG Holdco did not breach the contracts, Dye's release and waiver incorporated into the Separation Agreement remains valid. Therefore, Dye's claims for race discrimination and retaliation, age discrimination and retaliation, and intentional infliction of emotional distress against Press Ganey and PG Holdco fail. Moreover, Dye has failed to show any facts upon

which a reasonable jury could conclude that Vestar was his joint employer, which precludes all liability against Vestar. As a result, the Court now **GRANTS** Press Ganey and PG Holdco's and Vestar's motions for Summary Judgment and **DENIES** Dye's Motion for Summary Judgment.

## II.   RELEVANT BACKGROUND

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

On October 5, 2009, Press Ganey hired Dye as Vice President of New Sales and on March 9, 2010, Dye signed a Management Unit Grant Agreement ("MUGA") with PG Holdco that governed equity distributions to Dye resulting from his employment at Press Ganey. The MUGA gave PG Holdco the option to repurchase management units distributed to Dye upon his termination. *See* Doc. No. 89-1 at 13–14. The MUGA also required Dye to repay any proceeds from a repurchase of the management units in the event that he engaged in "Competitive Activity." *See id.* at 17. Based on the MUGA, one situation where Dye would have been deemed to be engaging in Competitive Activity was if he were to become employed by a corporation or other entity "engaged, wholly or in part in the Restricted Area . . . . *Id.* The MUGA defined "Restricted Area" as

> (i) the general area of measurement including, but not limited to, clinical, financial, operational and attitudinal data, (ii) data analytics and decision support tools, and (iii) products or services related to improvement solutions, educational programs, or taking any actions on, or publishing or reporting results in connection with, the general area of measurement, in all cases described in the foregoing clauses (i), (ii) and (iii) to or about health care or related institutional or employees thereof, or medical or other professionals operating in the health care industry, anywhere in the United States or any other geographic location where the Company [i.e., PG Holdco] or any of its Subsidiaries [e.g., Press Ganey] operates. "Restricted Area" also includes (x) any other in which the Company or

3

> any of its Subsidiaries provides services related to the general area of measurement or services relating to taking any actions on, or publishing or reporting results in connection with, the general area of measurement, decision support tools, data analytics and improvement solutions, or has substantially progressed towards providing such services, (y) marketing tools and services, or (z) any other business that the Company or any of its Subsidiaries is taking or has taken specific actions in furtherance of engaging in (so long as Executive [i.e., Dye] knew or reasonably should have known about such actions).

*Id.* at 10.

On February 24, 2012, Press Ganey's Board of Directors selected Patrick Ryan as its Chief Executive Officer. Before being selected as Chief Executive Officer, Ryan had developed concerns about the accuracy of Press Ganey's sales figures while he worked with a private equity investment firm conducting due diligence about the possible purchase of Press Ganey from PG Holdco in late 2011—a purchase that never materialized. After becoming Chief Executive Officer, Ryan discovered other issues of concern within the sales division. Ultimately, Ryan concluded that personnel changes were needed and on May 3, 2012, Ryan terminated Dye and two other officers in the sales division, Andy Lambert and Al Vega.

Soon after Dye's termination, his attorney and legal counsel for Press Ganey negotiated the terms of a Separation Agreement, which Dye signed along with Patrick Ryan representing Press Ganey, and Andrew Cavanna representing PG Holdco on June 1, 2012. The Separation Agreement provided that Press Ganey would pay Dye $111,574.28 in severance and that PG Holdco was exercising its options under the MUGA to repurchase Dye's management units for $76,745.88. In the Separation Agreement, Dye also released any claims he might have against Press Ganey and its "current and former officers, directors, employees, agents, investors, members, attorneys, shareholders, administrators, affiliates, divisions, parents, subsidiaries, representatives, predecessors and successor corporations and assigns." Doc. No. 1-4 at 4. As a

result, Press Ganey, PG Holdco, and Vestar were all beneficiaries of the Settlement Agreement's Release and Waiver provision. By signing the Separation Agreement, Dye also restated his commitment to the restrictive covenants outlined in the MUGA, to which Vestar was also a beneficiary.

About a month after his termination and less than a week after signing the Separation Agreement, Dye accepted a position with Intellimed International Corporation ("Intellimed"). Before he began working, however, Dye contacted Cavanna, a PG Holdco Board member and Vestar employee, about his prospect of working for Intellimed. Cavanna shared the exchange with Press Ganey executives and on June 13, 2012, Press Ganey informed Dye that his employment with Intellimed violated both the MUGA and his Separation Agreement. Dye began his employment with Intellimed on June 18, 2012, and remains employed there to this day. On July 5, 2012, Press Ganey informed Dye that because his employment with Intellimed violated the MUGA and Separation Agreement, it was stopping all severance payments due under the Separation Agreement and demanded that Dye return all sums already paid in severance payments and in the repurchase of Dye's management units.

## III. ANALYSIS

### A. Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in

5

the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

**B. Press Ganey and PG Holdco have established that no genuine dispute of material fact as whether Dye's employment with Intellimed violated the restrictive covenants of the MUGA and the Separation Agreement such that their breach of contract claim succeeds as a matter of law.**

In the MUGA and the Separation Agreement, Dye promised that, in exchange for management units, he would not work for any entity conducting business in the Restricted Area. Pursuant to the MUGA, businesses working in the Restricted Area include healthcare industry entities engaged in the general area of measurement including clinical, financial, operations and attitudinal data; data analytics and decision support tools; and products or services related to improvement solutions, education programs, or taking any actions on, or publishing or reporting

6

results in connection with, the general area of measurement. Doc. No. 89-1 at 10. The Restricted Area includes business entities similar to Press Ganey, which is an industry leader in health care performance improvement, specializing in strategic consulting services and data analysis, reporting, and benchmarking and works with more than 10,000 health care organizations nationwide, including 50% of all U.S. hospitals, to improve clinical and business outcomes.

Dye now works for Intellimed. Intellimed is a business operating in the healthcare industry. Intellimed's website along with the deposition testimony of its CEO, Robert Pickering, provide the necessary information to demonstrate that Intellimed is conducting business in the Restricted Area. According to its website, Intellimed "service[s] a nationwide client base of payors, hospitals, physician clinics, government agencies, employers, self-insured organizations and pharmaceutical companies." Doc. No. 1-5. In addition, Pickering confirmed in his deposition that hospitals, physician clinics, pharmaceutical companies, prosthetic companies and device makers are among the types organizations and institutions that purchase Intellimed's products.

Pickering also testified that Intellimed's activities include measuring various forms of clinical, financial, operational and attitudinal data. In particular, Intellimed uses publicly available state discharge data, UB-92 data from specific hospitals, demographic data, 3M APR D data, and other data bases. Intellimed also relies upon data that adjusts the UB-92 data for the severity of the conditions of the patients. Furthermore, Pickering testified that Intellimed collects inpatient, ambulatory, surgical and emergency department data from its customer hospitals reflecting gross charges, length of stay, age, sex and demographics along with numerous other things.

Pickering further confirmed that Intellimed utilizes data analytics and decision support tools to provide improvement solutions for customers as evidenced by reviewing the descriptions of

Intellimed's two primary products, IntelliClient and IntelliTrend. According to Intellimed's website, the IntelliClient product is "a fast, easy-to-use reporting tool that allows you to benchmark charges between hospitals, physicians and payors; understand above-average utilization of ancillary services and much more." Doc. No. 89-14 at 40. Among other things, IntelliClient allows Intellimed clients to conduct market and performance analyses and to monitor physician activity. *Id*. The IntelliTrend product specifically "uses the client's actual data to project patient demand by service for in-patient admissions, ambulatory surgeries and emergency department visits." *Id.* at 43. As Pickering testified, Intellimed's clients use these data analytics tools to manipulate the wide range of available healthcare data in a myriad of ways allowing clients to compare themselves with hospitals throughout the country across several metrics.

In sum, Intellimed's website and CEO confirm that the company (1) is in the healthcare industry; (2) conducts business in the area of clinical, financial, operational, and attitudinal measurement; (3) sells access to data analytics and decision support tools to its clients; and (4) provides improvement solutions and training programs to its clients using that data and those tools. There can be no serious question that Intellimed is in the Restricted Area as described in the MUGA that Dye signed. As a result, Dye breached his promise not to be employed in the Restricted Area when he took a job with Intellimed. As the MUGA provides, Dye is now contractually obligated to return the severance and management unit repurchase payments he received.

Despite Intellimed's clear activity in the Restricted Area, Dye claims that Press Ganey cannot lawfully keep him from working for Intellimed because Intellimed did not compete with Press Ganey. Dye appears to rely upon the phrase "Competitive Activity" used in the MUGA to

8

support his argument that he did not breach the Separation Agreement or MUGA. Specifically, Dye contends that in order for Press Ganey and PG Holdco to succeed here, they must prove that the MUGA meets the legal requirements for restrictive covenants and also prove that Intellimed and Press Ganey have competed head-to-head for business. Dye misunderstands what is prohibited activity under the MUGA and Separation Agreement. Under the MUGA, Dye would be engaged in the prohibited Competitive Activity if he (1) engaged in a competitive activity (*i.e.*, soliciting Press Ganey clients or interfering with Press Ganey's relationships with its clients); (2) worked in the Restricted Area; **or** (3) worked in an area into which Press Ganey is taking or has taken actions to expand, so long as Dye is aware of those actions. Because of the disjunctive language, each of the three types of Competitive Activity is prohibited. Violate any one and the MUGA is breached. Dye apparently ignores the second and third definitions and claims exclusively that Press Ganey is attempting to keep him from working for a competitor. In fact, it is the second type of "Competitive Activity"—working in the Restricted Area—that is crucial to Press Ganey and PG Holdco's claims.

Contrary to Dye's argument and its implication, Press Ganey and PG Holdco have not infringed on Dye's freedom of employment or his ability to seek or obtain employment. Consistent with case law, they have sought only the defined damages set forth in their agreements with Dye. The Seventh Circuit, applying Indiana law, addressed a similar issue in *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512 (7th Cir. 1988). In that case, the Seventh Circuit upheld the former employer's right to cease making severance payments when the former employee began competing in violation of a non-compete provision. The Court reasoned that "because an offer of benefits contingent on not competing holds less threat to the employee and the competitive process than

9

does judicial enforcement of a no-competition clause, we think that Indiana would have enforced the terms of the . . . contract had this suit been filed in state court." *Id.* at 517; *see also Tatom v. Ameritech*, 305 F.3d 737, 744 (7th Cir. 2002) ("Federal cases draw a distinction between provisions that prevent an employee from working for a competitor and those that call for a forfeiture of certain benefits should he do so.").

Delaware courts have also found forfeiture provisions similar to the one in the MUGA enforceable. In *W.R. Berkley Corp. v. Hall*, No. Civ.A. 03C-12-146 WCC, 2005 Del. Super. LEXIS 33 (Del. Super. Ct. Feb. 16, 2005), the defendant, a former employee of the plaintiff, executed an Incentive Stock Option Agreement providing that he could purchase stock in his employer's holding company at a significant discount. If the defendant exercised this option, he was obligated to remain employed with his employer for another six months. If he left his employer and engaged in activity competitive with that of his former employer, he was required to pay the full, market price of the stock. *Id.* at *4–8. Despite the agreement, the defendant exercised his stock option, left the plaintiff's employment three months later to work for a competitor, and refused to pay the higher stock price. The defendant brought suit to enforce the terms of the Incentive Agreement. *Id.* at *4–6.

The court disagreed with the defendant's argument that the payback provision was an unenforceable non-competition liquidated damages provision. *Id.* at *13. The court held that the defendant could "put whatever spin [he wanted] on [the forfeiture] provision, but to the Court it is simply a contractual obligation . . . ." *Id.* at *15–16. The court noted

> [The defendant] knew of this obligation and simply now is asking the Court to free him of this responsibility. The Defendant's freedom of employment and his ability to seek or move to a new job was not abridged by the Plaintiff nor were there any limitations on the Defendant to seek any job he so desired. All that is

10

> being sought here is the repayment of the financial benefit provided by the
> Plaintiff to the Defendant when he decided to exercise the option to leave
> according to the terms of the option agreement. The Court finds that he is simply
> contractually obligated to do so.

*Id.* at *16; *see also J.P. Morgan Chase & Co. v. Pierce*, 517 F. Supp. 2d 954, 962–63 (E.D. Mich. 2007) (applying Delaware law and enforcing a contractual claw-back for violations of an anti-competition provision of a stock option agreement); *IBM v. Martson*, 37 F. Supp. 2d 613, 619 (S.D.N.Y. 1999) (noting that under New York's employee choice doctrine "an employee who receives benefits conditioned on not competing with the conferring employer has the choice of preserving his benefits by refraining from competition or risking forfeiture of such benefits by exercising his right to compete.").

Just as in *W.R. Berkley Corp.*, Dye agreed to not take specific action, namely (1) competing with Press Ganey, (2) becoming employed by an entity in the Restricted Area, or (3) becoming employed by any entity in a business area where Press Ganey made efforts to expand if Dye was aware of those efforts prior to his termination. If Dye exercised his option to do any of those three things, he agreed to forfeit the sums he received.

Dye has not argued that any of the terms of the MUGA or Separation Agreement are unreasonable, ambiguous, or otherwise unenforceable. Nor has he argued that he was unaware of his contractual obligation when he signed the MUGA in 2010 or that he was unaware that he had reiterated the obligation in his Separation Agreement (negotiated by his attorney) in 2012. Dye has also admitted that he was aware that Press Ganey and PG Holdco considered his employment with Intellimed violative of the MUGA and Separation Agreement. Despite this information, Dye accepted employment with Intellimed. The court in *W.R. Berkley Corp.* stated:

> What is clear to the Court is that this litigation can only be characterized as a

11

> desperate attempt by the Defendant to avoid an agreement entered into in good faith by all the parties. The Court will not condone the Defendant's conduct nor accept its legally creative arguments in this matter.

*W.R. Berkley Corp.*, 2005 Del. Super. LEXIS 33 at *16-17. The *Berkley* court's sentiment resonates strongly with this Court as it faces similar facts in Dye's case here.

On March 9, 2010, Dye signed the MUGA in which he promised not to work for a firm in the "Restricted Area." In exchange for his promise, Dye received consideration from PG Holdco in the form of management units valued at $76,745.88. On June 1, 2012, Dye signed a Separation Agreement in which he reiterated the promises and provisions of the MUGA and released Press Ganey, its subsidiaries, and affiliates as well as its parents, investors, and shareholders, from all claims. As consideration for this contract, Press Ganey agreed to pay Dye $111,574.28 in severance and PG Holdco exercised its right under the MUGA to repurchase the management units from Dye. Dye's new employer, Intellimed, conducts business within the prohibited "Restricted Area" described in the MUGA. As such, Dye has violated the provisions of the MUGA and consistent with his promise, and the terms of the MUGA, Dye must return to Press Ganey and PG Holdco the money he received from them under the terms of the Separation Agreement.

Dye mistakenly relies upon the dispute between the parties about whether Intellimed and Press Ganey are or were direct competitors to defeat summary judgment. While there may be a genuine dispute as to this fact, the direct competition between Intellimed and Press Ganey is not material to the outcome of this case for the reasons described above. Therefore, Dye cannot defeat Press Ganey and PG Holdco's motion for summary judgment as to the breach of contract and declaratory judgment claims.

### C. The Release and Waiver provision in the Separation Agreement prevents Dye from raising claims of race and age discrimination, retaliation, and intentional infliction of emotional distress against Press Ganey, PG Holdco, and Vestar.

At oral argument, counsel for Dye conceded that the Release and Waiver incorporated into Dye's Separation Agreement would moot Dye's claims of race and age discrimination, retaliation, and intentional infliction of emotional distress ("the Remaining Claims") should the Court determine that Press Ganey, PG Holdco, and Vestar did not violate the Separation Agreement with the demand for return of the severance payments and the management unit proceeds. Indeed, the Court found just that, leaving neither a genuine dispute of material fact nor any legal dispute for the Court to resolve on the Remaining Claims. Moreover, the terms of the Release and Waiver protect all three entities—Press Ganey; PG Holdco, as Press Ganey's parent company; and Vestar, as an investor with interests in both Press Ganey and PG Holdco—from liability on the Remaining Claims. Therefore, the Court need not reach the substantive issues raised by the parties related to the Remaining Claims.

### D. Alternatively, Dye's claims against Vestar all fail as a matter of law.

Even if the Release and Waiver did not preclude liability on all counts for Vestar, Dye has not established any genuine dispute of material fact or any remaining legal dispute as to his claims against Vestar to overcome summary judgment.

#### 1. Vestar is not a party or in privity with a party to the MUGA or Separation Agreement and cannot be liable for any alleged breach of those contracts as a matter of law.

In making his case against Vestar, Dye argued that Vestar was a party to the MUGA and Separation Agreement making it liable for the alleged breach by Press Ganey and PG Holdco. Dye noted that Andrew Cavanna, a Vestar employee, signed the Separation

13

Agreement. Dye also identified Vestar as an affiliate of Press Ganey based upon the definitions within the contracts. Dye then contended that Vestar's status as a beneficiary of the restrictive covenants in the MUGA and the Release and Waiver in the Separation Agreement made it a party to the contracts. Dye also suggested that the involvement of Vestar employees, Norman Alpert and Andrew Cavanna, in the the negotiation and implementation of the contracts obligated Vestar to the terms of the contracts. The Court is not persuaded.

Under Indiana law, breach of contract claims may "be brought only against a party to the contract or against those in privity with a party." *Implement Serv., Inc. v. Tecumseh Prods. Co.*, 726 F. Supp. 1171, 1182 (S.D. Ind. 1989). When parties are not signatories to the contract or are not mentioned within the contract as parties or as parties in privity with a party, they are not parties who can be held to the terms of the contract. *See HMBI, Inc. v. Schwartz*, Cause No. 1:06-cv-24-TS, 2009 WL 2905535, at *6 (N.D. Ind. Sept. 8, 2009); *Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600 (Ind. Ct. App. 1993), *aff'd*, 638 N.E.2d 1228 (Ind. 1994). Moreover, "the identity of the parties to a contract is ascertained from an examination of the written instrument." *Sunman-Dearborn Cmty. Schl. Corp. v. Kral-Zepf-Freitag & Assocs.*, 338 N.E.2d 707, 709 (Ind. Ct. App. 1975). And Indiana law provides that privity is established when a "mutual or successive relationship as to the same right of property, or an identification of interest of one person with another as to represent the same legal right" exists. *Polinsky v. Violi*, 803 N.E.2d 684, 687 (Ind. Ct. App. 2004).

Review of the MUGA and Separation Agreement show that Vestar is likely a Press Ganey or PG Holdco affiliate. But the plain language of the contracts do not identify affiliates as parties or as being in privity to any party. In addition, no individual signed either contract

on behalf of Vestar. Andrew Cavanna signed the Separation Agreement, but only in his capacity as Treasurer of PG Holdco. "[D]irectors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent two corporations separately." *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998). As such, Cavanna was within his authority to sign the Separation Agreement in his role with PG Holdco without automatically turning Vestar, a separate corporation he represented, into a party.

Moreover, "[t]hird party beneficiaries have no contractual obligations, only benefits." *Tecumseh*, 726 F. Supp. at 1182–83. Therefore, Vestar's status as a beneficiary of the terms of the contracts do not turn it into a party or create privity with a party. Similarly, while the contracts may have obligated Press Ganey, PG Holdco, and Dye to maintain contact with Vestar through Alpert, communication with a Vestar representative during implementation of the terms of the contract does not make Vestar a party. Alpert's, Cavanna's, and Vestar counsel's participation in the negotiation of the Separation Agreement does not make Vestar a party either. As such, Vestar could not have been held liable for any alleged breach of contract even if it were not a beneficiary of the Release and Waiver provision.

> **2. Vestar did not retain sufficient control over Dye's employment relationship to support liability for alleged discrimination or retaliation pursuant to 42 U.S.C. § 1981, Title VII, or the ADEA.**

To prevail on his race and age discrimination and retaliation claims against Vestar under Title VII or the ADEA, Dye must prove that Vestar is his employer. *See EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 746–47 (7th Cir. 1998) (ADEA); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996) (Title VII). To prevail against Vestar under Section 1981 seeking protection of his right to make and enforce contracts regardless of his

15

race, Dye must establish that a contractual relationship existed between him and Vestar. *See* 42 U.S.C. § 1981; *Ulmer v. Elkhart Cnty.*, No. 3:02 CV 0560 PPS, 2005 WL 1910909, at *4 (N.D. Ind. Aug. 9, 2005). The absence of an employment relationship also demonstrates the absence of a contractual relationship between two parties. *Ulmer*, 2005 WL 1910909, at *4. Dye has failed to meet his burden on both issues.

As to the existence of an employment relationship with Vestar, Dye does not allege that Vestar is his direct employer. Instead, Dye contends that liability is appropriate under a joint employer legal theory.[1]

> In a "joint employer" relationship . . . there is no single integrated enterprise. A conclusion that employers are "joint" assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly. Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Nevarez v. TN Trailers, LLC*, No. 1:04 CV 486 WCL, 2006 WL 1128651, at *5 (N.D. Ind. Apr. 26, 2006) (quoting *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2nd Cir. 2005) (internal citations omitted). In determining whether two entities may be held liable as a joint employer courts consider whether there was an interrelation of operations between the two entities; centralized control of labor relations; common management; and common ownership or financial control. *Id.* (citing *Skidmore v. Precision Printing & Packaging Inc.*,

---

[1] The Court acknowledges that courts have also applied the economic realities and *de facto* or indirect employer tests when trying to determine whether an employment relationship existed in other discrimination cases. *See Clifford v. Patterson Cos., Inc.*, No. 08 C 0828, 2009 WL 3852447, at *9 (N.D. Ill. Nov. 18, 2009) (citing *Alexander*, 101 F.3d 487 at 493 n.2); *Caskey v. Colgate-Palmolive Co.*, 438 F. Supp. 2d 954, 962 (S.D. Ind. 2006). Because Dye conceded at oral argument that he is raising his claim under only the joint employer theory and because all the tests rely on the issue of control suggesting consistent outcomes using all three tests, the Court will only address the joint employer test here.

188 F.3d 606, 616 (5th Cir. 1999). "Traditionally, the second of these four factors has been considered the most important, such that courts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?" *Skidmore*, 188 F.3d at 617 (internal citations omitted). Said another way, to establish a joint employer relationship, the alleged constructive employer must have exercised control over the employee's day-to-day activities or workload. *Clifford*, 2009 WL 3852447, at *9–10. Dye has not established that Vestar retained sufficient control of his employment to be considered his joint employer.

Dye presents facts to suggest that Vestar actively advised Press Ganey on a wide range of matters. However, the Court need not assess those facts because they did not pertain directly to Dye's employment relationship. What is important is that Press Ganey hired Dye. Press Ganey established Dye's compensation and benefits. Dye reported to and was evaluated by Press Ganey sales team executives. Dye considered himself an employee of Press Ganey. Press Ganey maintained Dye's employment records. Press Ganey's CEO terminated Dye. Press Ganey stopped severance payments to Dye under the Separation Agreement.

Vestar admits that its employees Alpert and Cavanna, in their roles as members of PG Holdco's board of directors, learned that Dye had been terminated after the termination had occurred. Vestar also admits that Alpert and Cavanna were involved in the negotiation of the Separation Agreement to help Press Ganey and PG Holdco address what was a challenging situation. Even these concessions, however, do not demonstrate that Vestar controlled Dye's employment relationship sufficiently to be his joint employer.

As discussed above, Alpert's and Cavanna's conduct as directors of PG Holdco are

separate and distinct from their conduct as Vestar employees.  In addition, assisting with the negotiation of the Separation Agreement did not give Vestar control over the Agreement and Dye.  The signatories to the Agreement retained control of the terms of the Agreement.  Most importantly, Dye has not shown that Vestar had any control over his day-to-day activities or workload while he was employed at Press Ganey.  Indeed, Press Ganey hired and fired Dye and controlled all aspects of his employment regardless of any alleged advice from Vestar to other Press Ganey executives.  Therefore, without the requisite employer relationship, Dye's Title VII and ADEA claims against Vestar fail as matter of law.  Without an employment relationship or any other evidence that Vestar was a party, or privity to a party, to the MUGA an Separation Agreement, Dye also lacks the necessary contractual relationship with Vestar to support liability under Section 1981.  Therefore, his Section 1981 claim against Vestar also fails as a matter of law.

### 3. Dye's intentional infliction of emotional distress claim against Vestar fails as a matter of law.

Vestar argues that Dye's operative counterclaim for intentional infliction of emotional distress ("IIED") fails to allege anything against Vestar.  Vestar is correct.  Vestar was added as a counterclaim defendant in this action on November 19, 2012.  On December 21, 2012, Dye amended his counterclaims, including his IIED counterclaim, to include Vestar.  In that version of Dye's IIED counterclaim, he alleged all the elements of IIED against "Counterclaim Defendants," which Dye admits includes Vestar.  *See* Doc. No. 36 at 5–6.  However, Dye amended his answer and counterclaims again on May 24, 2013.  In that version of the IIED counterclaim, Dye only alleged the elements of IIED against "Plaintiffs," not "Vestar" and not "Counterclaim Defendants."  Doc. No. 69 at 33–34.  Dye has not amended his counterclaims

again leaving the May 24th version operative. Therefore, because Vestar is not a Plaintiff in this action, he is also not a defendant as to Dye's operative IIED counterclaim. Even if Vestar were a proper defendant to Dye's IIED counterclaim, however, his claim would be waived because Dye released his rights to sue Vestar for IIED pursuant to the Release and Waiver provision in the Separation Agreement he signed. Therefore, the IIED claim against Vestar fails as a matter of law regardless.

### IV. CONCLUSION

As stated earlier, the core of this dispute is an employment relationship that deteriorated and was ultimately terminated. However, part of the employment relationship was governed by a contract (the MUGA) and the termination was governed by another contract (the Separation Agreement), both of which prohibited Dye from accepting employment with an entity that engaged in "Restricted Activity." Because the Court has now concluded that there are no material facts in dispute and that Dye has violated the terms of his employment and termination contracts, Press Ganey and PG Holdco are now entitled to the benefits of their contracts with Dye, which include the return of all sums paid to Dye under the Separation Agreement and the waiver of all claims Dye may have had against Press Ganey, PG Holdco, and Vestar.

For the reasons discussed above, the Court **GRANTS** Press Ganey and PG Holdco's Motion for Summary Judgment [Doc. No. 87]; **GRANTS** Vestar's Motion for Summary Judgment [Doc. No. 86]; and **DENIES** Dye's Motion for Summary Judgment [Doc. No. 85]. In addition, because the Court did not rely upon any of the evidence that Dye and Vestar asked the Court to strike, the Court also **DENIES AS MOOT** Dye's Motion to Strike [Doc. No. 95]

and Vestar's Motion to Strike [Doc. No. 103]. The Clerk is **INSTRUCTED** to enter judgment in favor of Plaintiffs/Counterclaim Defendants, Press Ganey and PG Holdco, and Counterclaim Defendant, Vestar, in the amount of $92,685.06 plus costs.

Additionally, in light of this ruling, the scheduled Final Pre-Trial Conference and Jury Trial are now **VACATED** and this case is now **TERMINATED**.

**SO ORDERED.**

Dated this 19th day of March, 2014.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge